The State *vs.* Wisdom.

THE STATE *VS.* WISDOM.

1. The general rule on the subject of permitting testimony to be given of matters not alleged, is, that nothing shall be given in evidence which does not directly tend to the proof or disproof of the matter in issue.

2. On an indictment for stealing a slave, evidence is not admissible of conversations, held by the prisoner, with other slaves, eighteen miles from the place where the offence is charged to have been committed.

3. Though the *fact*, that such prisoner was at a particular place, not far distant from the point where the crime was perpetrated, might be shewn, in order to trace him, step by step, to the place where the larceny was committed.

4. But evidence of any act, by the prisoner, or his general conduct, not connected with the crime, should not be received.

5. Evidence offered by a prisoner, of his assertion of a claim to property stolen, when he was arrested, cannot be received— such a claim must be asserted before, or at the taking, to enable the defendant to give evidence of his own declaration, and the *bona fides* of the assertion, is for the consideration of the jury.

6. An instrument of writing, produced in pursuance of notice to that effect, may be read by the party who has required the production; but if he does not choose to give it in evidence, the mere notice will not have the effect to allow the party in whose possession it has been, to read it without proof.

7. The stealing of a slave, cannot be established in any other or different manner, than the stealing of any other chattel endowed with volition, and the power of locomotion. Nor can an individual commit larceny in one county, who is at the time of its commission in another, and who is not near enough to assist those who are active in its perpetration.

8. An individual to whom a slave is hired, is *pro hac vice* the owner of the slave, during the term for which he is hired, and may be described as such, in an indictment for stealing the slave; but the insertion of the true owner's name, in an indictment, will not render the proof irrelevant. The indictment may be supported, by proof of possession by the person hiring the slave.

9. There is no repugnance, in charging the ownership of the slave in different persons, in different counts of the same indictment.

Indictment for negro stealing, tried before *Harris*, J.

The prisoner was indicted for negro stealing, at a term of the Circuit court of Dallas county : on his application, the venue was changed to Wilcox county, where he was tried, convicted, and sentenced to death, by the Circuit court of the latter county. Several questions were reserved by the presiding judge, for the consideration of this court, which may be stated in the following order :—

1. A witness was introduced on behalf of the State, who testified, that about the first of April, a few days before the larceny charged in the indictment was committed, he saw the prisoner on several different days, at Athens, in Dallas county, about eighteen miles distant from the place from whence the negro was stolen : that the prisoner was a stranger there, and had no apparent or ostensible business : that he saw the prisoner, on one

occasion, holding a long conversation with a negro slave belonging to the witness, whilst no white person was present, and that when the witness went to the place where the prisoner and the slave were conversing, the former ceased the conversation with the slave: and that he also saw the prisoner, on another occasion, holding a private conversation with another slave, in the same town, shortly after.

This evidence was objected to by the prisoner; but his objection was overruled.

2. Another witness, on behalf of the State, testified, that after the negro charged to have been stolen, had been some time missing, he traced him to Mississippi, and found him at a mill belonging to the prisoner; about eight miles distant from which, he found the prisoner himself. There was no evidence adduced on the part of the State, either of the acts or declarations of the prisoner, when he was arrested. The prisoner's counsel then proposed to ask the witness, if, when he was arrested, the prisoner did not claim the negro as his own property, and whether he did not then produce a bill of sale, made by one John Martin, to him. The court refused to permit these questions to be answered. The prisoner's counsel then proposed to offer in evidence the said bill of sale, without producing any proof of its authenticity : but the court refused to permit it to be given in evidence. It was then shewn, that the prisoner had received notice, from the solicitor, to produce said bill of sale on this trial. The court then ruled, that as the State had not offered the bill of sale as evidence, and as

no facts or circumstances were shewn, relative to its authenticity, the prisoner could not give it in evidence.

3. A witness testified, on behalf of the State, that the prisoner, about the ninth day of April, eighteen hundred and thirty-eight, between ten and eleven o'clock in the day, was discovered by him near where the negro slave, Dick, was at work, about sixty feet from him : the prisoner was on a horse, apparently turning off from the place where Dick then was : that the prisoner then immediately went to a field, about three hundred yards distant, where a negro slave, named Peter, (who was stolen at the same time,) was at work, and rode up to the fence, near where Peter was : the negroes were missing about eight o'clock of the night of the same day. Another witness testified, that some time in the spring of the year, eighteen hundred and thirty-eight, the prisoner arrived about eight o'clock in the morning, at his house, which is about forty miles distant from Cahawba, and in Perry county : that the prisoner had two negroes with him; one of them was the slave Dick, and the other the witness described, as other witnesses described Peter. There was no evidence that the prisoner was seen with the negroes in Dallas county, after ten or eleven o'clock of the day of the night during which they left Cahawba. The prisoner's counsel requested the court to charge the jury, that unless they believed the prisoner was in company with the negroes in Dallas county, at the time, or after they left Cahawba, he could not be indicted in Dallas county, and therefore, they should acquit him. The court refused to give this charge, but instructed the jury, that if they believed the prisoner had concerted with the

negro, to go off with him to Mississippi; and the negro, in pursuance of such concert, had left the possession of his master, and was then under the direction, and was acting under the control of the prisoner; they were authorised to infer, the negro was in his possession from the time he left the possession of his master, although the prisoner might have been in Perry county.

4. James M. Lenoir testified, that the negro, Dick, mentioned in the bill of indictment, was the property of Matilda Lenoir : that he was her guardian, and that at the time when the larceny was committed, the negro was hired to Charles G. Edwards.

5. The prisoner moved to quash the indictment, because the counts were repugnant to each other, in charging the slave to belong to different individuals; it being stated in one count, as the property of James M. Lenoir; in another, as the property of Matilda Lenoir; and in a third, as the property of Charles G. Edwards; which motion the court overruled.

*Attorney General*, for the State.

GOLDTHWAITE, J. The correctness of the several decisions made by the Circuit court, on the questions reserved by it, will be considered in the order in which they are presented.

1. The general rule on the subject of permitting testimony to be given of matters not alleged, is, that nothing shall be given in evidence, which does not directly tend to the proof or disproof of the matter in issue. A leading case, illustrative of this principle, is cited in Philips'

Evidence, p. 170—Upon an indictment for an infamous crime, an admission, by the defendant, that he had committed such an offence at another time, and with another person, and had a tendency to such practices, ought not to be received. Archbold, in his treatise on Criminal Pleading, asserts, that, *in fact,* there is no exception to this rule in criminal cases, although there are some, which *seem* to be so. It will be unnecessary to examine those cases which seem to present exceptions to this rule, as the one now to be considered, presents no claim to be classed as such. It is difficult to perceive, what other tendency, than to create a prejudice against the prisoner, the proof that he was seen talking with other slaves, at the distance of eighteen miles from the place where the crime is charged to have been committed, could have. It certainly did not, nor could, show his guilt in the particular transaction charged against him : If evidence of this character is permitted to affect an individual, he ought to be allowed the chance to explain and controvert it, but this he never could be prepared to do, unless advised before the trial, of what was to be urged against him. The fact, that the prisoner was seen at Athens, a few days before the commission of the crime, was properly enough in evidence, as directly tending to shew, that he was in the same section of the State where the crime was committed; and it might be important to trace him, step by step, from thence to the place of the larceny : but evidence of any act, or his general conduct, not connected with the crime charged, ought not to have been received. In a case otherwise doubtful, and depending purely on circumstancial evidence, a fact like

The State vs. Wisdom.

the one detailed by the witness, might and would have a direct tendency to produce the most fatal consequences, to the accused. The circumstance, in itself, is trivial and unimportant; but connected with the charge laid in the indictment, ceases to be so, and would operate with fearful effect on a stranger. We cannot suppose, from the other facts which are detailed, that this evidence could have weighed a straw in the balance; but we are not sitting to determine the weight of the testimony, but to pronounce the law as to its competency. It was improper evidence, and ought not to have been admitted.

2. The evidence offered by the prisoner, of his assertion of a claim to the slave, when he was arrested, was properly rejected, as was also all the evidence touching the bill of sale. The general rule, that one shall not be permitted to make evidence for himself, is familiar to every lawyer; but the prisoner's counsel supposes that the case of larceny creates an exception, as one who takes property under a *bona fide* caim of right, cannot be guilty of this offence. This claim of right must be asserted before, or at the taking, to enable the prisoner to give evidence of his own declarations; and even then, the *bona fides* of the assertion, is always a subject for the consideration of the jury. To permit one, after the act committed, to give his own assertions in evidence to establish a claim, would, in most cases, defeat the ends of justice, if any reliance was placed on such assertions.

The notice given by the solicitor, to produce the bill bill of sale on the trial, did not authorise the prisoner to use it without proof. The rule as to the introduction of such evidence, is clearly laid down by most elementary

authors on evidence, and may be stated thus: If produced on the motion, it may be read by the party who has requested its production, but if he does not choose to give it in evidence, the mere notice will not have the effect to allow the party in whose possession it has been, to read it without proof—(2 Starkie on Ev. 360.) A different rule would produce the result of making evidence, by the mere act of notice; and a false instrument might be introduced, which it would be difficult, if not impossible, to disprove.

3. The most important question presented, is the one arising out of the charge of the court. It assumes that the prisoner could commit a larceny in Dallas county, although he may not have been there when it was committed. The charge requested was, "that unless the jury believed the prisoner was in company with the negroes in Dallas county at the time, or after they left Cahawba, he could not be indicted in Dallas county, and therefore, they should acquit." The instructions given were, "that if they (the jury) believed the prisoner had concerted with the negro to go off with him to Mississippi; and the negro, in pursuance of that concert, had left the possession of the master, and was then under the direction, and was acting under the control of the prisoner, they were authorised to infer that the negro was in his possession from the time he left his master, although the prisoner might have been in Perry county." To determine whether these instructions were correct, resort must be had to the statute: this provides, "if any person shall steal any negro or mulatto slave whatsosver, out of, or from the possession of the owner or overseer of

such slave; the person or persons so offending, shall be, and are hereby declared to be felons, and shall suffer death."

There is no new rule introduced by it, from which we can presume that the general assembly intended to provide that the stealing of a slave should be established in any other or different manner, than the stealing of any other chattel endowed with volition and the power of locomotion. Most of our sister States, possessing this description of property, have deemed it essential to the interests of their citizens, to make the inveigling or enticing slaves from their owners, high offences. It must be evident to all, that in many cases besides mere larceny, slaves may be wholly lost to their owners, by the acts or contrivances of others; and we cannot doubt the propriety of some amendment to our criminal code, in this particular. Our duty, however, is performed, when we decide on the laws as they exist, without suggesting alteration or change. To constitute larceny, there must not only be a taking, but a *carrying away*. A bare removal, however, from the place where the goods are found, though the thief does not make off with them, is a sufficient asportation or carrying away—(4 Blacks. Com. 231.)—As, for instance, if a man be leading another's horse out of a close, and be apprehended in the fact. It must not be supposed, that a literal interpretation is to be placed on the term, carrying away: if one entice a horse, hog, or other animal, by placing food in such a situation as to operate on the volition of the animal, and he *assumes the dominion over it, and has it once under his control*, the deed is complete: but if we suppose

him detected before he has the animal under his control, yet after he has operated on its volition, the offence would not be consummated.    In the case of slaves, which not only possess volition, and the power of loco-motion, but also intelligence, a further extension of the principle is called for, and must necessarily be introduced into the law of larceny.    It cannot be supposed, that the legislature intended only to punish those who forcibly took possession of the slave, as well against his, as his master's will : it was, without doubt, considered, that in many, perhaps most cases, the stealing would be effected by operating on the will of the slave.    In such a case, *actual control,* at the instant of stealing, would never be exhibited.    The same rules which apply to principals in the second degree, will, when examined, seem to af-ford the most direct analogies to cases of this description. It is not necessary that the party should be actually pres-ent, or even an eye witness of the transaction ; he is, in construction of law, present, aiding and abetting, if, with the intention of giving assistance, he be near enough to afford it, should the occasion arise—(Foster, 347 ; Rex vs. Borthwick, 1 Doug. 207 ; Rex vs. Owen, R. & M. 96.)—but he must be sufficiently near to give assistance—(Rex vs. Stewart, R. & R. 363)—and the mere circumstance of a party going towards a place where a felony is to be committed, with intent to aid and assist in carrying off the property, and assisting in carrying it off, will not make him a principal in the second degree, un-less at the time of the fellonious taking, he were within such a distance as to be able to assist in it—(Rex vs. Kel-ly, R. & R. 421.)    And although an act be committed in

The State *vs.* Wisdom.

pursuance of a previous concerted plan between the parties, those who are not present, or so near as to be able to afford aid and assistance at the time when the offence is committed, are not principals—(Rex vs. Sears, R. & R. 25; Rex vs. Davis, ibid. 113; Archbold's C. L. 4 a.)

If it is admitted, that the slave departed from the service of his master, in consequence of a concerted plan between the prisoner and himself, that the former might steal him, and that the latter would join him in Perry county, the offence was not consummated until the prisoner was sufficiently near the slave to aid him, if pursuit was attempted; or so near as to be capable of taking actual control over him;—if, then, his will consented to the act, the larceny would be complete, and the prisoner subject to the punishment: until then, it could not be, because both the slave and himself might have repeated; and the one have returned to his master, the other to his home.

Although the evidence was sufficient to warrant the strongest presumptions that the prisoner was with the slave in Dallas county, and could perhaps only be satisfactorily rebutted by establishing an *alibi*, the law does not authorise the charge given, because *an individual cannot commit a larceny in one county, who is, at the time of its commission, in another, and who is not near enough to aid and assist those who are active in its perpetration.*

4. The next question is not very distinctly presented; it seems, however, to be this: whether the possession of one to whom a slave is hired, is the owner, within the meaning of the term, as used in the statute. Such an individual is *pro hac vice* the owner of the slave, during

the time for which he is hired, and may therefore be described as the owner.   But we by no means wish to be understood as deciding, that, in such a case, the insertion of the true owner's name in the indictment, would render the proof irrelevant, or that such an indictment might not be supported by proof of possession, with the person hiring the slave.

5.  The last question referred, may be shortly answered; that there is nothing repugnant in charging the ownership of the slave in different persons, in different counts of the same indictment.   This was a precaution which is always advisable under similar circumstances.

For the error in admitting the evidence stated in the first point referred, as well as for the erroneous charge,— the judgment of the Circuit court is reversed, and the case is remanded, with instructions to cause the prisoner to be tried in due course of law.